Burtt Will

Argued November 28, 1944; reargued April 10, 1945.
Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

218

*Samuel P. Hagerman,* for appellant.

*John W. Speckman,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, November 26, 1945:

This appeal concerns the revival of a revoked will.

The protracted litigation in this case was occasioned by the attempt of a layman to write his own will. The danger attending such an effort is aptly suggested by the late Judge JOHN MARSHALL GEST in his interesting book, *Drawing Wills and Settlement of Estates in Pennsylvania.* He employs the following language: "Every man who knows how to write thinks he knows how to write a will, and long may this happy hallucination possess the minds of our lay brethern, for surely St. Ives, the patron Saint of lawyers, extends to none a heartier welcome in the life beyond than to the Jolly Testator who makes his own will."

Decedent, in his holographic testamentary effort, succeeded in raising a question which for over two centuries has perplexed English and American judges and divided courts in both countries. The controversial topic is the *revival* of a prior will by the revocation of a later will. Extensive discussions on the question appear in the decided cases, legal encyclopaedias and articles in law

magazines and reviews, including one by a recent member of the United States Supreme Court written when an active lawyer and law school professor. To the already difficult problem decedent has added another question which has never before been squarely raised and decided in Pennsylvania, viz: does a distinction exist between a later revoked will containing an *express* clause of revocation and one where the revocation is occasioned because of *inconsistent* provisions? It is upon this subsidiary question that the litigation hinges.

Judge HUNTER, the hearing judge in the orphans' court, ruled that testator's later will revoked his earlier one because of *inconsistent* provisions, under Section 20 of the Wills Act of June 7, 1917, P. L. 403, 20 PS section 181. He decided that under *Ford's Estate,* 301 Pa. 183, 151 A. 789, the evidence clearly indicated that decedent did not intend to revive the earlier will. He decreed that probate of the earlier will should be set aside. A majority of the court in banc reversed in an opinion by President Judge VAN DUSEN. It was decided that because there was no *express clause* of revocation in the later will the earlier will was revived. Judges HUNTER and SINKLER dissented. This appeal followed.

The facts are undisputed. Decedent, a layman, in his late eighties, with a modest estate of $3500, was employed by, and had a desk in the office of, a highly respected member of the Philadelphia Bar. He was unmarried. His nearest of kin was a cousin. In a search for a will after the death, there was found in a locked drawer of his desk at the office, a mass of testamentary papers in decedent's handwriting consisting of between 50 and 60 sheets. None of the papers bore his signature except a will of 1906 and a will of 1939 in which the signature had been cancelled. There was also a note addressed to his executor, but it contained no testamentary dispositions. These papers constitute decedent's testamentary effort. The will of 1906 was the only paper susceptible of probate. It was probated.

This holographic will of 1906, written thirty-three years prior to the later cancelled will of 1939, is a mere remnant. In it 198 words are crossed out, three paragraphs are entirely obliterated and a fourth paragraph partially so, and 34 words are interlined. The words "Invalid" and "N. G." appear at the top of the paper and the word "Invalid" on the back, all in decedent's handwriting. With the cancellations eliminated, the remaining dispositive words are:

". . . it shall revert in its entirety, to . . . aforesaid; or, failing her by reason of her decease, said legacy

Mrs. Elizabeth Ange-

shall revert to her children,

      man

the survivor or survivors of them

    3607 Fairmount Avenue, West Philadelphia."

Whether such a jumble of words constitutes an effective testamentary disposition is a matter of grave doubt. But however difficult it may have ultimately proven to declare testator's intent, we regard the writing, standing alone, as probatable, with its meaning a matter of will construction. See *Rockett Will*, 348 Pa. 445, 35 A. 2d 303, and cases therein cited.

The later will of 1939 was likewise imperfect. It consisted of five sheets of paper, in testator's handwriting, held together with a sliding metal clip. The will was not dated, but its approximate date was proven by the subscribing witnesses to be in the middle of August 1939. It disposed of the estate in an *entirely different manner* than the earlier will of 1906. Testator's signature and those of the subscribing witnesses to the 1939 will were crossed out.

It was proven by parol evidence that at the time decedent signed the will of 1939, he said that he was about to make a new will. A letter, signed by testator and written a few days after he executed the 1939 will, stated that he was then engaged in preparing another will as the final expression of his wishes. We are there-

fore confronted with a probatable will, which had been revoked by a later inconsistent will. As such later will was subsequently revoked by cancellation, the ancient question arises whether evidence may be adduced to prove that testator did not intend to revive the prior will.

A will is defined by Blackstone, Vol. II—*449 as "The legal declaration of a man's intentions, which he wills to be performed after his death." It has been declared that this definition stands unchallenged for its simplicity and accuracy: *McCune's Estate*, 265 Pa. 523, 109 A. 156; *Gibson's Estate*, 128 Pa. Superior Ct. 44, 193 A. 302. In determining whether any particular testamentary writing constitutes a will, it must first be ascertained whether it is a *legal* expression of the decedent's testamentary intentions. Thus, where a decedent had executed a probatable will, which he later revoked, and then had cancelled or revoked such revoking will, must the first will be accepted as the exclusive expression of the decedent's testamentary wishes? Frequently it appeared that the first will had been lost, misplaced or forgotten, or in destroying or revoking the later revoking will, decedent really intended to die intestate. Whether circumstances or expressions indicative of such intent are admissible to establish that decedent did not intend to *revive* the first will is a troublesome question.

In early times there existed a divergence of opinions between the ecclesiastical law and the common law. The ecclesiastical courts decided that the revocation of the first will took effect *at the execution* of the second one, but that the first will might be *revived* if the evidence disclosed this to be the testator's *intention*. The common-law courts, on the contrary, took the position that a revocation of a prior will was *ambulatory* and therefore did not take effect until the death of testator; if the revoking will itself was subsequently revoked the former will stood as if the later will had never been executed. Two statutes were enacted by the English Parliament:

the Statute of Frauds, 29 Car. 11 (1676), C. 3, section 6, providing that no written will should be revoked "but by writing"; and the Statute of Victoria, 7 Wm. IV & 1 Vic. C. 26, section 20 and section 22, which provided that "No will . . . which shall be in any manner revoked, shall be revived, otherwise than by the re-execution thereof. . . ." The English statutes settled the question in that country. Since the adoption of the Statute of Victoria, in England, once a will is revoked it may not be revived except by a formal republication.

In America, the forty-eight states have variously adopted the ecclesiastical law, the common law, or statutes upon the subject. For a review of the cases and articles supporting the foregoing summary see: 68 Corpus Juris, page 856, et seq.; Jarman on Wills (7th Ed.), Vol. 1, page 178; Page on Wills (Lifetime Edition), Vol. 1, page 858, et seq.; Hutton's Wills in Pennsylvania, page 218, et seq.; article by Professor W. W. Ferrier, Jr., "Revival of a Revoked Will", 28 California Law Review 265; article in 28 Kentucky Law Journal 227; annotation to *Whitehill v. Halbing* (Conn.), 28 A. L. R. at page 911; article by Owen J. Roberts (late a Justice of the United States Supreme Court), "The Revival of a prior Will by the Revocation of a Later Will", Vol. 48, The American Law Register, page 505.

The pivotal question in this case—may an intention be shown not to revive a former will where a later revoked will is *inconsistent* therewith—has been considered by various courts and authors. An examination of the cases, text books and articles above noted convinces us that the conclusions reached in 28 Kentucky Law Journal, at page 229, et seq., explain the situation most accurately: "Due to hasty statements on the part of text-writers and ill-considered dicta on the part of courts there is much more confusion on this matter than is justified by the actual holdings of the courts. This confusion is due in no small part to the fact that decisions are so often affected by the various state

statutes and because different jurisdictions follow different rules." And further, at page 233: "The question whether there is a distinction between a later will which revokes by express terms and one which revokes by implication, only, is inseparably connected with the proposition that express revocation is immediately effective. In many states this question is settled by statute. Although there are many dicta on the question only three states are generally conceded to distinguish between the two kinds of wills, and of these, only one has given . . . an unequivocal decision in both respects." The three states referred to by the writer are Texas, Michigan and Wisconsin. It is also interesting to note that this question was considered by the Hon. Roscoe Pound, a commissioner to the Supreme Court of Nebraska and later the Dean of the Harvard Law School, in *Williams v. Miles*, 68 Neb. 463, 62 L. R. A. 383. Commissioner Pound recommended, and it was adopted by the Supreme Court of Nebraska: ". . . if the testator destroys a subsequent will revoking a former one either expressly or by implication, such act, of itself, will not operate to revive the former will . . . whether the former will is revived, depends upon his *intention which is to be deduced from all the circumstances*" (italics supplied).

The reason advanced for distinguishing between a revocation by *express words* and one by *inconsistent terms* reverts to the old argument as to *when* the revocation of the former will is effective. As noted above, the common-law theory was that a clause of revocation, like a dispositive provision, was ambulatory in nature and was therefore not effective until death. The ecclesiastical courts regarded the revocation as *immediate*, but held that testator's intention *not* to revive could be shown. The few states which make this distinction regard the revocation by inconsistency as ambulatory. Logically there is no basis for such distinction. If a will is effectively revoked under any

of the terms of the Wills Act, the intention of the testator concerning the revival or non-revival of the prior will should be permitted to be shown. Apparently the first case in the United States to promulgate the distinction was *James v. Marvin,* 3 Conn. 576, but this case was subsequently overruled by *Whitehill v. Halbing,* 98 Conn. 21, 118 A. 454.

The distinction has never before been squarely raised in Pennsylvania. It is true that in the opinion in *Ford's Estate* are quoted cases and text-book writers which make a distinction between express revocation and revocation resulting from later inconsistent provisions. This discussion is, of course, a *dictum,* as *Ford's Estate* concerned a will in which there was an *express clause of revocation.* There is no difference *in principle* between a revocation by an *express clause* or by *inconsistent provisions.* If a testator bequeaths his estate to A, but subsequently concludes to give it to B, there is no fundamental difference in the expression of intention if testator says in the later will, "I revoke the bequest to A and give it to B", or if he says, "I give all my estate to B." In either instance testator has effectively revoked his former will in accordance with the provisions of the Wills Act. *McClure's Estate,* 309 Pa. 370, 165 A. 24, specifically ruled that an inconsistent will operates as a revocation of the former will. Justice KEPHART (later Chief Justice) said (page 375) : "A will which makes a complete disposition of all the property of the testator is clearly incompatible with the existence of any former will, and it must operate as a revocation of all wills previously executed (1 Jarman on Wills, page 333), or, as stated in Teacle's Est., 153 Pa. 219, 'must operate as a revocation without express words to that effect.' ". We re-affirmed this principle, and cited *McClure's Estate* with approval, in *Hartman's Estate* (No. 1), 320 Pa. 321, 326, 182 A. 234. Because a revocation is effectively accomplished either by an express clause of revocation or by inconsistent provisions, it

follows that in either case, proof of the revocation may be established by the production of the later written will with testator's signature, duly cancelled, even though not susceptible of probate. It is not correct to state that proof of a revoked, unprobatable, *inconsistent* will is an extension of the doctrine of *Ford's Estate*. It is merely *applying* the doctrine.

There are apparently only six reported appellate cases in Pennsylvania which deal with the question of the revival of a former will by the cancellation of a later revoking will.

The first case, arising in 1792, was *Lawson v. Morrison*, 2 Dallas 286. In that case testatrix executed her will in 1775. She wrote a later will in 1779. Both wills were kept in the possession of a third person. At the death of testatrix the later will of 1779 was not found, although the will of 1775 remained intact. The contents of the will of 1779 were not proven and it was not established that it had revoked the former one. The syllabus concisely states: "The fact of the execution of a second will, not found at the decease of the testator, and the contents of which are not shown, is not, *ipso facto*, the revocation of a former one; to have that effect, its existence must be shown, at the death of the testator, or that he cancelled the latter will, with an intent to die intestate." McKEAN, the Chief Justice, wrote (page 290) : "Here is a good *subsisting* Will properly attested: There is no way to defeat it, but by proving it was revoked by another will, *subsisting* at the death of the Testatrix, *or that she cancelled the latter Will, so revoking all former ones, with a mind to die intestate"* (italics supplied). It will thus be noted that as early as 1792 this Court stated that upon proving that a later will revoked the former one, the earlier will was not revived *where the testator was shown to have an intent to die intestate.*

The next case, which arose in 1796, was *Boudinot v. Bradford*, 2 Dallas 266. Testator executed a will, but later made another will which he later destroyed. Dr.

Rush (probably Dr. Benjamin Rush) testified to declarations of testator that he had made and destroyed his later will intending to die intestate. The court ruled that such testimony was admissible to establish "whether, by cancelling the second will, [testator] meant to revive the former instrument, or to die intestate." Chief Justice McKEAN, in his opinion, sustained this ruling and said (page 268) "1st. Where a second Will is made, containing an express clause of revocation, the preceding Will, though not formally cancelled, is revoked. 2d. Where a second Will is destroyed, without more, the preceding will, not having been cancelled, is, generally speaking, *ipso facto*, revived. 3d. Where a second will is cancelled, *under circumstances that manifest an intention either to revive, or not to revive,* the preceding Will, those circumstances must be proved." (Italics supplied.)

Apparently the next case, in 1848, was *Flintham v. Bradford,* 10 Pa. 82. Testator made his will in 1821, which he revoked by a will made in 1824. Two questions were raised: (1) "whether the will of 1821 was restored and revived by the cancellation of the posterior will of 1824", and (2) "whether the evidence offered . . . and rejected . . . ought to have been admitted." The will of 1824 revoked the earlier one by *inconsistent* provisions. The signature to the 1824 will had been cancelled. Testimony was offered and rejected to prove the changed condition of testator's estate between the date of the first will and that of a later will in 1835, and declarations of testator *after 1835* inconsistent with an intention to revive the will of 1821. Chief Justice GIBSON sat as the Nisi Prius judge. In rejecting the evidence, he said (page 85) : "It was accurately said by Chief Justice McKEAN, in Lawson v. Morrison, 2 Dall. 286, that the destruction of a will which repealed or superseded a previous one, leaves the first as if the second had not existed, *unless it be clearly proved that the second was destroyed with a view to die intestate.* Such is the result whether the second contain a clause of revocation or not;

for neither of them takes effect till the testator's death; the revocation of the second restores the first to the footing on which it stood before the second existed; and the first necessarily, as well as naturally, takes effect at the death, *unless the testator had signified by some decisive act or declaration, at the time of the revocation, an intention to die intestate."* (Italics supplied). The Chief Justice also said that testimony indicating testator's intention to revive or not to revive the former will must relate to "the time of destruction" of the later will, otherwise it would be a parol revocation forbidden by statute (i. e. Wills Act of 1833). The Supreme Court, in an opinion by COULTER, J., affirmed the ruling of Chief Justice GIBSON. Justice COULTER stated that if it was clearly proven that the testator, at the time he cancelled the posterior will, *intended to die intestate* (i. e. not to revive the earlier will) such evidence was admissible as part of the *res gestae*. He also stated that the *act of the preservation of the prior will* was evidence of intent to revive. But the Justice also said (page 90) that the prior will had been preserved by testator *"entire, and without intentional or apparent blemish"*, (Italics supplied.) which, as has been shown, is not the fact in the present case.

In 1909 the case of *Kerchner's Estate,* 41 Pa. Superior Ct. 112, was decided. Testatrix made two wills. She burned the second will, declaring at the time, "the other last will shall count". It was decided, in an opinion by BEAVER, J., that the burning and declaration revived the first will, although the republication was by parol.

The next case, decided in 1911, was *Manning's Estate,* 46 Pa. Superior Ct. 607. Here the testatrix made two wills. A few days before her death she burned the second will and said *she intended to have a new will made.* The Superior Court, in an opinion by HENDERSON, J., decided that the burning of the second will was *not* a revival of the earlier will in those circumstances.

The leading case is *Ford's Estate,* 301 Pa. 183, 151 A. 789, decided in 1930. Testator, by a later will con-

taining a *clause of revocation,* revoked all former wills. He cancelled this later will by tearing off his signature, declaring at the time that he intended to die intestate. It was decided that the earlier will was not revived. The opinion was written by Justice SCHAFFER, later Chief Justice. The ancient argument of the common law was strongly advanced that the revoking will was ambulatory and, as it was cancelled and destroyed in the lifetime, the prior will was to be regarded as never having been revoked. This contention was rejected. Justice SCHAFFER pointed out that the revocation of the earlier will was established by a cancelled will signed by testator. While this will was not dispositive because of its mutilation, it nevertheless constituted "another writing" under the Wills Act. It was decided that the evidence of what was said by decedent when he cancelled the later will was admissible to show his intent *not* to revive the earlier will.

In discussing whether a non-probatable will constituted "another writing" under the Wills Act, Justice SCHAFFER said (page 188) : "The court below bases its conclusion on the provisions of the 20th section of the Wills Act of June 7, 1917, P. L. 403, 409, which reads: 'Section 20(a) No will in writing, concerning any real estate, shall be repealed, nor shall any devise or directions therein be altered, otherwise than by some other will or codicil in writing, or other writing declaring the same, executed and proved in the manner hereinbefore provided; or by burning, cancelling, obliterating, or destroying the same by the testator himself, or by someone in his presence and by his express direction. (b) No will in writing, concerning any personal estate, shall be repealed, nor shall any bequest or direction therein be altered, otherwise than as hereinbefore provided in the case of real estate' (with an exception as to nuncupative wills).

"We think the court too narrowly and literally viewed the language of the act and disregarded circumstances which should play a part in a just determination of what

the legal situation was which was created by the testator's acts. At the very outset of reasoning about the matter let it be observed that we are not dealing, as the court below seems to have concluded, with an attempt to set up an oral revocation of the will of 1924. It was revoked by writings admittedly signed by the testator, which writings so signed are produced. The court below says they are to be disregarded as writings to revoke the earlier will because as wills they could not be effective until he died, and neither for legal reasons was so effective. Dispositively this is so, but as 'other writings' which could be and were proved in the manner wills are, they were facts, which established that by solemn written declaration the decedent had wiped out the will of 1924. As against this we are asked to presume that when he tore and directed the further tearing of the pages of the 1927 will and thus revoked it, he intended to revive the one of 1924 when every circumstance in the record indicates that he did not."

On three occasions since, this Court has re-affirmed this principle, and has cited *Ford's Estate,* with approval. See *Shetter's Estate,* 303 Pa. 193, 154 A. 288; *Harrison's Estate,* 316 Pa. 15, 20, 173 A. 407; *Koehler's Estate,* 316 Pa. 321, 322, 175 A. 424. The construction of Section 20 (a) of the Wills Act of 1917, supra, so enunciated in *Ford's Estate,* was repeated in *Shetter's Estate,* supra, page 197, in this language: ". . . The statute, however, does not limit revocation to 'some other will' but opens the door to 'other writing', and does not say this 'other writing' may not be an ineffective will, so long as it appears, as it does here, that the testator signed it."

We are not unmindful that apparently Justice SHARS-WOOD did not regard an unprobatable will as "another writing" under the Wills Act. He so said in *Rudy v. Ulrich,* 69 Pa. 177. A careful examination of that case reveals that such statement was dictum. There the second will *never revoked* the first one because it was obtained by undue influence and was therefore void in its

entirety. A later case, *Hamilton's Estate,* 74 Pa. 69, quoted Justice SHARSWOOD's *dictum.* But this statement was a dictum upon a dictum. In that case, the second will never became effective because of a conditional provision, and hence the first will was never in fact revoked. No question of *revival* of a revoked will existed in either case. While the doctrine expressed by such dicta is in accord with the dissent in *Ford's Estate,* that case, and the three cases which follow it, ruled precisely to the contrary.

*Ford's Estate* was decided on September 29, 1930. This Court construed the 20th Section of the Wills Act of 1917, supra, and held an unprobatable will, signed by a testator, was "another writing" within the Act. This decision, unless changed by the legislature, has the same effect as if written into the body of the statute. Since the decision in *Ford's Estate,* there have been eight regular sessions of the Pennsylvania Legislature. If the legislature believed that the decision was contrary to the intent and language of the Wills Act, it could easily have so amended the 20th section of that Act as to make the decision in *Ford's Estate* no longer controlling in cases arising subsequent to the amendment. In *Salvation Army Case,* 349 Pa. 105, 36 A. 2d 479, we said at page 110: ". . . this Court's construction of an act has the same effect as if written into the body of the statute at the time of its enactment: Lerch's Estate, 309 Pa. 23, 28, 159 A. 868; see Buhl's Estate, 300 Pa. 29, 32, 150 A. 86; Barnes Foundation v. Keely et al., 314 Pa. 112, 126, 171 A. 267. If our interpretation were not consonant with the legislative purpose, it was within the power of the legislature to amend the Act in order to effectuate that purpose. It is most significant, therefore, that two legislatures have convened and adjourned since our former decision, and no amendment to the Act, as construed by us, has been enacted by the legislative body. See Chester School District's Audit, 301 Pa. 203, 214, 151 A. 801; Lower Nazareth Twp. App., 341 Pa. 171, 175, 19 A. 2d 92."

The doctrine of *stare decisis* still prevails in Pennsylvania. To change a legal principle vitally affecting property rights is a legislative and not a judicial function. This Court has always rigidly adhered to the rule of *stare decisis*. A statutory construction, once made and followed, should never be altered upon the changed views of new personnel of the court. All of the cases reciting our policy to adhere strictly to the rule of *stare decisis* need not be collected and reviewed. What was said by us in a few of the latest cases will suffice: Mr. Chief Justice MAXEY said in *Monongahela St. Ry. v. Phila. Co. et al.*, 350 Pa. 603, 616, 39 A. 2d 909, "The doctrine of stare decisis is recognized and applied by the courts of this Commonwealth. In Smith v. Glen Alden Coal Co. et al., 347 Pa. 290, 32 A. 2d 227, this Court, speaking through the same Chief Justice, said (page 302): 'A rule of property long acquiesced in should not be overthrown except for compelling reasons of public policy or the imperative demands of justice.' The doctrine of *stare decisis* is not confined to cases involving 'rules of property.' See Kilpatrick v. Commonwealth, 31 Pa. 198, 210, and Commonwealth v. National Oil Co., Ltd., supra, '*Stare decisis* simply declares that, for the sake of certainty, a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different': Heisler v. Thomas Colliery Co., 274 Pa. 448, 452, 118 A. 394." Mr. Justice HORACE STERN said in *Commonwealth v. Wucherer*, 351 Pa. 305, at 308, 41 A. 2d 574: "Even were it deemed a doctrine which should no longer prevail, certainly, in the face of so venerable a history, the remedy should be sought, not in the courts, but in the legislature; the function of the former (at least where principles have become firmly imbedded in the warp and woof of judicial interpretation) being to declare what the law is, and that of the legislature to change existing law by statutory fiat"; and in *Davis v. Pennsylvania Co., etc.*, 337 Pa. 456, at 464, 12 A. 2d 66: "An interpretation

of law consistently followed by an appellate court over so long a period that it has become fundamentally imbedded in the common law of the Commonwealth should not be changed except through legislative enactment, which is a remedy always available and the proper one under our scheme of government. Otherwise the law would become the mere football of the successively changing personnel of the court, and 'the knowne certaintie of the law', which Lord Coke so wisely said 'is the safetie of all', would be utterly destroyed."

The remaining question is whether the finding of the hearing judge "that testator had no intention, at the cancellation of the will of 1939, to revive the will of 1906, but on the contrary the cancellation was made with the intention of making a new will", is supported by the evidence. It was overwhelmingly established that testator did *not* intend to revive the 1906 will. In addition to the completely different disposition in the will of 1939, testator wrote the words "Invalid" and "N. G." on the will of 1906 (then thirty-three years old); he wrote letters, produced in evidence, that he was engaged in preparing a new will; and together with the many other reasons recited by the hearing judge the intent *not* to revive appears most conclusively. It is clear that testator preserved the mass of writings merely as memoranda and guides to his future contemplated testamentary "masterpiece", on which, according to his letter, he was then already engaged. As the hearing judge has stated, "The one circumstance in favor of the will of 1906 is its mere existence." Testator's intention will not be defeated by a groundless distinction between a later cancelled will containing an express clause of revocation and one making a completely inconsistent disposition. The earlier will in either case is *presumptively* revived. However, in this case, such *presumption* has been *rebutted* by evidence which overwhelmingly establishes testator's intention *not* to revive the prior will.

The decree of the court below is reversed. Costs to be paid by the appellees.

Justices LINN and PATTERSON dissent.

___

DISSENTING OPINION BY MR. JUSTICE LINN:

The question in this case is very simple: what did the legislature mean by section 20(a) of the Act of June 7, 1917, P. L. 403, 20 P.S. 271? "No will in writing . . . shall be repealed, nor . . . altered, otherwise than by some other will or codicil in writing, or other writing declaring the same, executed and proved in the manner hereinbefore provided"; the words "in the manner hereinbefore provided" refer to section 2, 20 P.S. 191, that "in all cases [the revocation] shall be proved by the oaths or affirmations of two or more competent witnesses; otherwise . . . shall be of no effect." [1] We have held, in cases to be cited, that oral revocation was prohibited.

A will must be signed at the end, and if offered for probate, the signature must be proved by two witnesses. If the revoking paper is a will admitted to probate, no question arises: *McClure's Estate*, 309 Pa. 370, 165 A. 24, is an example. If the revoking paper is not a will but an "other writing," (the words used in section 20) it must be proved as a will is proved, that is, it must have a signature and the signature must be proved.[2] If after signing a paper, the signer cancels his signature while the paper is still under his control, it is not one that can be proved as a will must be proved because by erasing his signature he has declared that the document shall not be his effective legal act; after its cancellation,

___

[1] The Act was a re-enactment of similar provisions of the Act of 1833, which was construed, contrary to the view now taken by the majority, in *Rudy v. Ulrich*, 69 Pa. 177, and *Hamilton's Estate*, 74 Pa. 69.

[2] "A writing declaring its revocation must be produced signed by decedent before an earlier will can be rendered nugatory." *Shetter's Estate*, 303 Pa. 193, 154 A. 288.

there is no signature to prove. When appellant offered the document of 1939, it had no signature and was therefore not provable, as section 20 required; it should therefore not be held to have revoked the will admitted to probate.

The court now decides, as I understand it, that revocation may be shown by oral evidence. The opinion states that the decision is supported by *Ford's Estate,* 301 Pa. 183, 151 A. 789, but in that case the "other writings" relied on (there were two of them, p. 195) were signed; in the course of the opinion, Mr. Justice SCHAF-FER stated that the prior will "was revoked by writings admittedly signed by the testator which writings so signed are produced."

The majority opinion states that *Ford's Estate* was followed in three cases. But in what respect was it followed? The rule followed was that there may be no oral revocation. In the first case, *Shetter's Estate,* 303 Pa. 193, 154 A. 288, the opinion states: "We there ruled [in *Ford's Estate*] that there can be no oral revocation of a will." At page 197 we said: "A writing declaring its revocation must be produced, signed by the decedent, before an earlier will can be rendered nugatory." The other two cases, *Harrison's Estate,* 316 Pa. 16, 173 A. 407, and *Koehler's Estate,* 316 Pa. 321, 175 A. 424, also declared that revocation cannot be proved by oral testimony. These cases therefore show that the decision now made is a departure from the rule formerly applied.

The majority opinion speaks of *stare decisis.* The opinions in the *Ford, Shetter, Harrison* and *Koehler* cases say that oral revocation cannot be proved. *Stare decisis* would seem to require that in this case also we should hold, with the learned court below, that there can be no oral revocation. The record is clear that there is no signed "other writing"; no "other writing" with a signature capable of being proved by two witnesses as was the case with the two writings in *Ford's Estate.*

The majority opinion speaks of rebutting a presumption of revival. The attempt to rebut was by oral evi-

dence, though we have consistently stated that oral revocation was prohibited.

I would affirm the decree appealed from.

---

DISSENTING OPINION BY MR. JUSTICE PATTERSON:

I cannot agree with the majority opinion. The conclusion is unsupported by, and contrary to, the cases cited, imputes to the testator an intention wholly inconsistent with the admitted facts, and would impose upon the law of Pennsylvania an unwarranted extension of a principle, the soundness of which is seriously questioned.

Thomas A. Burtt died October 6, 1941, unmarried and without issue, leaving as next of kin a cousin, Jennie Burtt Wildrick, appellant. He was a layman, and for 33 years was employed by and had a desk in the office of a member of the Philadelphia bar. In the drawer of this desk he constantly kept his will of 1906. It may properly be assumed that he had some knowledge of the law of wills, and purposely destroyed the will of 1939. He left an estate of $3,500. From all the facts and circumstances Burtt, the decedent, departed this life in the firm belief that he would die testate. Nowhere in the record can there be found any suggestion that he wished to die intestate.

This conclusion is supported by the following undisputed facts: Found in a drawer of the desk at which he worked for many years was a will dated November 26, 1906. In the same drawer were found 50 or 60 pages of testamentary writings. Among these were six sheets of paper held together by a metal clip, constituting in part a cancelled will without a first page containing the usual formal directions and revocatory clause, executed some time in August, 1939. Decedent's signature thereon, as well as those of the two witnesses, had been canceled by testator by pen strokes through the respective names. The date of cancellation does not appear. The majority

and minority opinions of the orphans' court and the majority opinion of this Court concede that the will of 1906 was the only subsisting and probatable will. Numerous interlineations and cancellations appear thereon. Certain paragraphs had been crossed out, and in the handwriting of testator, at the top of the will, were written "Invalid" and "N. G." On the outer cover of the will he wrote the word, "Invalid." Unsigned marginal notations in testator's handwriting explained the cancellation of various paragraphs of the will or portions thereof, e. g., where the beneficiary died there appeared the word "deceased", and in the body of the will the name of such beneficiary was stricken out; the executor named in the will having died, a marginal notation appeared that another executor was to be appointed.

The third item of the will, with marginal notations in Burtt's handwriting, disposing of the residue, appears as follows:

"Third. All and every article or articles, money or monies of my said estate, personal *deleted as shown ahead* or mixed, which may remain in hand or in balance after deducting my reasonable funeral expenses and the sums previously mentioned in Items First and Second, hereinabove, shall, without reservation or restriction whatsoever, be delivered to and paid over to my almost life-long friend, Lucas ("Luke") J. Krespach, *Deceased* Sexton of St. Joseph's Roman Catholic Church, Willing's Alley, 4th and Walnut Streets, Philadelphia, Pa.; or, failing him by reason of his decease, then it shall revert, in its entirety, to *Deceased* his sister, Mrs. Annie Muller (Miller), at present residing at No. 634 North 46th Street, at Philadelphia aforesaid or, failing her by reason of her decease, said legacy

    Mrs. Elizabeth Ange-
shall revert to her children,
    man
the survivor or survivors of them."

Proponents of the will, appellees, are Elizabeth Miller Angemann, Harry Miller, Luke Miller, Joseph E. Miller, and Henrietta C. J. Miller, children of Annie Miller, deceased.

The disposition made of decedent's estate under the canceled incomplete will of 1939 was inconsistent with that of the subsisting will of 1906.

At the time testator signed his will of 1939 he remarked that he intended to make a new will, and in a subsequent letter to the witnesses of said will stated that he had already prepared some of the pages for the new will. There was not, however, any other subsequent will.

Jennie Burtt Wildrick appealed from the probate of the will of 1906. The hearing judge concluded (1) that the will of 1906 was impliedly revoked by the typewritten pages of 1939 because the disposition of property was totally inconsistent, and (2) that all the evidence clearly manifested an intention not to revive the will of 1906. A majority of the court *en banc* reversed the hearing judge and held, not as the majority opinion points out, "that because there was no *express clause* of revocation in the later will the earlier will was revived", but, that the will of 1906 *had never been revoked* and was, therefore, properly admitted to probate as the last will and testament of Thomas Burtt. This appeal followed.

The orphans' court was unanimous in holding that the will in question had probative value, and the majority opinion of this Court states that "we regard the writing, standing alone, as probatable . . ." In *Seiter's Estate,* 265 Pa. 202, 206, this Court said: ". . . before the question of revocation or cancellation can come up, it must appear that a perfect will was in existence upon which such question might be founded." Proper determination of this case requires that this Court determine the time at which a subsequent will containing no revocatory clause but making disposition of property inconsistent with that of the former and uncanceled will becomes effective as a revocation of the former will. We cannot assume, as does the majority opinion, that "We

are therefore confronted with a probatable will, which had been revoked by a later inconsistent will." Whether there has been a revocation is the issue here. The pivotal question is not as the majority opinion states, "may an intention be shown not to revive a former will where a later revoked will is *inconsistent* therewith." *The issue is not revival but revocation. Revival presupposes revocation. There can be no revocation other than in the manner prescribed by the Act. Revocation, therefore, to be effective, must be made in compliance with Section 20(a) and (b) of the Wills Act, 20 P.S., Sections 271 and 272.*[1] *There can be no parol revocation of a written will. "What the statute intended to prevent is parol revocation . . ."*: *Ford's Estate,* 301 Pa. 183, 195; *Seiter's Estate,* supra, 206; *Holmes' Estate,* 240 Pa. 537, 542.

Confusion among the decisions regarding the effect of a subsequent will upon a prior will arises from conflicting rules enunciated by the ecclesiastical and the common law courts of England. The former held that revocation took effect upon the execution of the later will but that the earlier will might be revived if the evidence disclosed that the testator so intended: *Ex parte Hellier,* 3 ATK 798, 26 Eng. Rep. 1256 (1754). The latter held that all wills were ambulatory and were inoperative and of no effect until the death of the testator.

---

[1] "No will in writing, concerning any real estate, shall be repealed, nor shall any devise or directions therein be altered, otherwise than by some other will or codicil in writing, or other writing declaring the same, executed and proved in the manner hereinbefore provided; or by burning, canceling, obliterating, or destroying the same by the testator himself, or by someone in his presence and by his express direction": Act of 1917, P. L. 403, Section 20(a).

"No will in writing, concerning any personal estate, shall be repealed, nor shall any bequest or direction therein be altered, otherwise than as hereinbefore provided in the case of real estate, except by a nuncupative will made under the circumstances set forth in section four of this act, and also committed to writing in the lifetime of the testator, and, after the writing thereof, read to or by him and allowed by him, and proved to be so done by two or more witnesses": Act of 1917, P. L. 403, Section 20(b).

Cancellation of a subsequent will eliminated the canceled will as effectively as if it had never been written. It never had any operation.

Ecclesiastical courts had jurisdiction of a will of personal estate, and common law courts were concerned only with a will of real estate. See *Flintham v. Bradford,* 10 Pa. 82, 91; *Goodright v. Glazier,* 4 Burr 2512, 2514, 98 Eng. Rep. 317, 319. To eliminate this conflict and to insure one common rule, Parliament enacted the statute of 1 Victoria, C. 26, Section 22 (1837), which provided that when a subsequent will making inconsistent disposition of property or expressly revoking an earlier will was canceled and destroyed the former could become effective only by a formal republication and reexecution.

Examination of the statutes of the respective states removes from consideration many conflicting views upon the question of revocation. The statutes of 16 states specifically provide that there shall be no revival of a former will by reason of the destruction of the subsequent will unless, by the terms of the revoking instrument or republication of the former, it has been reinstated.[2] By necessary implication, therefore, in these 16 states revocation must be considered as effective immediately upon the execution and publication of the sub-

---

[2] *Alabama*, Title 61, Section 26; *Arkansas*, C. 170, Section, 14528; *California, Probate Code*, C. 3, Section 75; *Georgia, Wills*, C. 113-403; *Idaho, Wills*, 14-307; *Kansas, Wills*, 22-242; *Missouri, Wills*, C. 1, Art. 20, Section 525; *Montana, Wills*, C. 77, Section 6999; *New York, Wills*, Art. 2, Section 41; *North Dakota, Civil Code, Wills*, Section 5664; *Ohio, Wills*, Section 10504-54; *Oklahoma*, Title 84, Section 106; *Oregon, Wills*, Section 18-304; *South Dakota, Wills*, Section 56.0222; *Utah, Wills*, 101-1-23; *Washington, Probate Code*, Title 10, C. 3, Section 1405. Section 41 of the Decedent Estate Law of New York provides: "If, after the making of any will, the testator shall duly make and execute a second will, the destruction, canceling or revocation of such second will, shall not revive the first will, unless it appear by the terms of such revocation, that it was his intention to revive and give effect to his first will; or unless after such destruction, canceling, or revocation, he shall duly republish his first will."

240

sequent will. It is, therefore, clear that the rule of law in these states can have no application here.[3] New Mexico statute provides that the former will must be *acknowledged* as valid: *New Mexico, Wills,* 32-109. The statutes of Nevada, Virginia, and West Virginia provide. that there must be a re-execution of the former will: *Nevada, Wills,* Section 9913;[4] *Virginia, Wills,* Title 46, Section 5234; *West Virginia, Wills,* Section 4046. These three statutes are practically identical with the English statute. See *Clark v. Hugo,* 107 S. E. 730 (Va.). Indiana and Iowa laws provide for revocation by the "execution" of a subsequent will: *Indiana, Wills,* C. 3, 7-301 (3455); *Iowa, Wills, Exrs. & Admrs.,* Section 11855.[5] The California statute has been similarly construed: *In re Shute's Estate,* supra; *Lones v. Lones,* 41 Pac. 771. The Georgia Code distinguishes between an express and implied revocation. The former annuls the instrument immediately while the latter takes effect only at the time that the instrument becomes effective as a will: *Georgia, Wills,* C. 113-402. The statutes of Colorado, Connecticut, Tennessee and Wyoming do not contain any provision for revocation by an "other writing": *Colorado, Wills and Estates,* C. 176, Section 40; *Connecticut, Execution*

---

[3] *Barker v. Bell,* 46 Ala. 216; *In re Shute's Estate,* 131 P. (2d) 54 (Cal.); *Harwell v. Lively,* 30 Ga. 315; *In re Rinker's Estate,* 147 P.(2d) 740 (Kan.); *In re Toomey's Estate,* 31 P.(2d) 729 (Mont.); *In re Hill's Estate,* 29 NYS(2d) 185; *Melhase v. Melhase,* 171 Pac. 216 (Ore.).

[4] "If, after the making of any will, the testator shall duly make and execute a second will, the destruction, canceling, or revocation of such second will shall not revive the first will, unless it appear by the terms of such revocation that it was the intention to revive and give effect to the first will, or unless, after such destruction, canceling or revocation, the first will shall be duly reexecuted": *Nevada, Wills,* Section 9913.

[5] "Wills can only be revoked in whole or in part by being canceled or destroyed by the act or direction of the testator, with the intention of so revoking them, or by the execution of subsequent wills. When done by cancellation, the revocation must be witnessed in the same manner as the making of a new will": *Iowa, Wills, Exrs. & Admrs.,* Section 11855.

*& Probate of Wills,* C. 256, Section 4880; *Tennessee, Probate of Wills,* Section 8097; *Wyoming, Probate Code,* 88-105. The decisions of the courts of these states may properly be considered here because we are not concerned with revocation by an "other writing" but only by an "other will." In *Whitehill v. Habling,* 98 Conn. 21, 118 Atl. 454, 455, the court held that one who attempts to show revocation by an other will "must show in fact that it was *revoked* by an other will which subsisted at the *death* of the testator . . ." In *Hickey v. Beeler,* 171 S. W. (2d) 277 (Tenn.), the court held that when the latter of two inconsistent wills is destroyed by the testator in his lifetime, the prior will remains unaffected since all wills are ambulatory. No cases appear in the reports of Colorado and Wyoming on this issue. The Louisiana code provides that all wills are revocable until testator's death: *Louisiana, Revocation of Testaments,* Art. 1690. The statutes of the remaining 21 states are substantially similar to that of Pennsylvania. Of these states which have passed upon this question, the courts of Florida (*Schaefer v. Voyle,* 102 So. 7), Illinois (*Stetson v. Stetson,* 66 N. E. 262), Minnesota (*In re Tibbetts' Estate,* 189 N. W. 401), North Carolina (*Marsh v. Marsh,* 48 N. C. 77), Rhode Island (*Bates v. Hacking,* 68 Atl. 622), and South Carolina (*Kollock·v. Williams,* 127 S. E. 444; *Taylor v. Taylor,* 2 Nott & Mc. 482), adopt the common law rule and *hold that revocation by a will making inconsistent dispositions is effective only if the subsequent will is valid and subsisting at testator's death.* Until then it is ambulatory. The courts of Kentucky (*Slaughter's Adm'r. v. Wyman,* 14 S. W. (2d) 777), Maryland (*Rabe v. McAllister,* 8 A. (2d) 922), Michigan (*Cheever v. North,* 64 N. W. 455), Mississippi (*Bohanon v. Walcot,* 1 Howard 336, Miss.), Nebraska (*Williams v. Miles,* 94 N. W. 705), New Hampshire (*Lane v. Hill,* 44 Atl. 393), New Jersey (*In re Davis' Estate,* 35 A. (2d) 880) and Texas (*Brackenridge v. Roberts,* 270 S. W. 1001) follow the ecclesias-

tical rule and hold the revocation to be effective immediately and make revival of the prior will a question of intent. In Massachusetts, while *Pickens v. Davis,* 134 Mass. 252, holds that there must be evidence to show an intent to revive, *Sewall v. Robbins,* 29 N. E. 650, requires that the later will be produced and probated.

There are, therefore, 27 states in which statutory provisions control the question here presented. Of the remaining 21 statutory enactments 16 have been construed, 7 according to the common law rule and 8 according to the ecclesiastical rule. Connecticut and Tennessee must be considered as supporting the common law rule, which will increase the number of courts adopting the common law and Pennsylvania rule to 9, and leave 8 adopting the ecclesiastical rule of construction. The holdings of the Massachusetts courts appear to be confused. The decisions of this Court place Pennsylvania in the group adopting the common law rule. *Only by a strained interpretation and reliance upon unfortunate dictum in some of the cases has the majority opinion reached a contrary conclusion.*

In *Lawson v. Morrison,* 2 Dallas 286 (1792), there was only one will in existence at the time of death and this Court held that the same was properly admitted to probate. The decision was based upon an alternative argument by Justice McKean: "the mere circumstance of making the Will of 1779, is not *virtually* a revocation of the former, the contents being *unknown,* and it not appearing to have been *in esse* at her death, but rather the contrary, and that she had cancelled or destroyed it. No other person was interested in its destruction, from anything I can discover, except the appellant, or his brothers, who were not in *America;* and charity will induce a presumption, that she herself destroyed it. *If this is the fact, the first Will is not thereby revoked, as neither could be complete wills, until the death of the testatrix, and her destroying it had the same effect as if it never existed,* unless it had been clearly proved, that she did it

with an intention to die intestate. Should a contrary opinion hold, to wit, that the first Will was revoked, at the *instant* the second was executed, yet the cancelling of the second by the Testatrix herself is a revival of the first, if undestroyed. *Harwood v. Goodright,* Cowp. 92." (Italics supplied).

This opinion further states: "Here is a good *subsisting* Will properly attested: There is no way to defeat it, but by proving it was revoked by another Will *subsisting* at the death of the Testatrix, or that she cancelled the later Will, so revoking all former ones, with a mind to die intestate." The word *"subsisting"* was stressed and it is apparent that the Court considered revocation by a subsequent will to be effective only if the later will was *"subsisting"* at the death of testator. In the instant case there is only one probatable and subsisting will. Admittedly, the will of 1939 had been destroyed by testator. Not until his death could either will take effect. The will of 1906 is the only "subsisting" will.

The case of *Boudinot v. Bradford,* 2 Dallas 266 (1796), while containing the statement by Justice Mc-Kean that "Where a second Will is cancelled, under circumstances that manifest an intention either to revive, or not to revive, the preceding Will, those circumstances must be proved", also contains the following explanatory statement: "The mere act of making a second testament, is a revocation of a preceding testament, *in relation to personal estate;* the law throwing the personal estate on the executor as a trustee." This case is erroneously relied upon by the majority opinion for the reason that the distinction recognized by the courts in 1796 between wills of personal estate and wills of real estate no longer exists. That distinction has been removed by our Wills Act. Further, in *Flintham v. Bradford,* supra, 92, the *Boudinot* case was referred to as a case *"sui generis,* with strong peculiarity of facts." Chief Justice Gibson, who heard the case at Nisi Prius, criticized the dictum in *Boudinot v. Bradford* and *Lawson v.*

*Morrison.* Justice COULTER, speaking for this Court, in *Flintham v. Bradford,* supra, 90, adopted the following language of Lord Mansfield in *Goodright v. Glazier,* supra: " 'A will . . . is ambulatory till the death of the testator. If testator lets it stand till he dies, it is his will. If he does not suffer it to do so, it is not his will. Here he had two. He has cancelled the second. It has no effect, no operation. It is as no will at all, being cancelled before his death. But the former, which was never cancelled, stands as his will' ". *Kerchner's Estate,* 41 Pa. Superior Ct. 112, falls within those cases where a subsequent will cannot be shown to have existed because of its complete destruction. See *Shetter's Estate,* 303 Pa. 193, 197.

In *Shetter's Estate,* supra, *Harrison's Estate,* 316 Pa. 15, and *Koehler's Estate,* 316 Pa. 321, this Court held that revocation by a later will or other writing could not be established by parol testimony. In each of these cases the document constituting the purported revocation was not produced. In *Shetter's Estate* the testimony showed that the document had actually been completely destroyed.

*Ford's Estate,* supra, does not support the majority opinion. There the clause of revocation contained in the later will which was subsequently revoked by tearing the signature from said later will was held to constitute an "other writing" within the Wills Act. The correctness of this conclusion need not be questioned here. Suffice it to say that the majority opinion in this case constitutes an unwarranted extension of a doubtful principle. *The will of 1939 does not contain a revocatory clause. If it be effective to revoke a former will it is by reason of its existence as an "other will" within the meaning of the Wills Act, supra. Both in fact and law, however, it does not exist as an "other will."* Testator intentionally destroyed all possibility of it ever becoming effective as such. *The cancellation of the will by voiding his signature thereon is no less a revocation than destruction by burning.* If the revocation had been by

burning, *Shetter's Estate,* supra, would be applicable and no effect whatsoever could be given to its former existence. *The rationale of the majority opinion, however, is that although legally testator has destroyed said will, nevertheless, by virtue of its physical existence it remains effective to defeat testator's only probatable and subsisting will. This, however, is not and should not be the law in Pennsylvania.*

The majority opinion is in error in concluding that the paper with the canceled signature, not provable as a will must be proved, may, nevertheless, be admitted in evidence and be effective to revoke a valid subsisting will *although the Wills Act requires the same proof in both instances.* Cf. *Rudy v. Ulrich,* 69 Pa. 177.

*McClure's Estate,* 309 Pa. 370, stressed as an authority for the proposition that a will making inconsistent disposition of property with that of a former will operates to revoke all former wills immediately upon its execution, likewise does not support the conclusion of the majority opinion. The correctness of that decision cannot be challenged. In that case, and in every other case where this Court has pronounced an effective revocation by a later will, *there was in existence at the death of testator another valid and subsisting will capable of being proved as required by the Wills Act.* See *Gensimore's Estate,* 246 Pa. 216, 220. *In the instant case there is only one probatable will; that is the will of 1906.* The canceled will of 1939 could not have been probated. *Cancellation of the signature destroyed it for all purposes as effectively as if it had been burned.* Destruction of testator's signature rendered it incapable of being *proved* in the manner required by the Wills Act. To work a revocation, the later will must be duly executed and proved: *McKenna v. McMichael,* 189 Pa. 440, 442. Also see *Harrison's Estate,* supra; *Koehler's Estate,* supra; *Shetter's Estate,* supra. Failure of the majority opinion to recognize this essential difference results in the erroneous conclusion that

"Because a revocation is effectively accomplished either by an express clause of revocation or by inconsistent provisions, it follows that in either case, proof of the revocation may be established by the production of the later written will with testator's signature, duly canceled, even though not susceptible of probate."

That the unsigned notations "Invalid" and "N. G." and others do not of themselves void the will must be conceded: *Williams' Estate,* 336 Pa. 235, 237; *Evans's Appeal,* 58 Pa. 238, 248. The majority opinion, however, considers them together with other oral and written statements made by testator at the time the canceled will of 1939 was executed and subsequent thereto as establishing that "testator did *not* intend to revive the 1906 will." Again the majority opinion erroneously assumes the fact at issue—revocation of the will of 1906. *Ford's Estate,* supra, is not authority for holding such evidence admissible. In that case this Court held that the words spoken at the time the signature was torn from the will were admissible to show the intent with which the act was done. It was said (p. 198) : "It is not the tearing up of a will that works its revocation, it must be torn up *animo revocandi* by the testator or at his direction, and when inquiry is made to show the intent, it opens up all the circumstances of what occurred at that time, including as the most important of all what the maker of the will said in the act of revoking it." (Italics supplied.) See *Flintham v. Bradford,* supra, 92. Declarations of an intention to make a new will cannot operate to effect a revocation of an existing will: *Teacle's Estate,* 153 Pa. 219, 224. "A mere intimation by a testator of his intention by a future act to make a new disposition, does not effect an actual present revocation": *Rife's Appeal,* 110 Pa. 232, 235. The evidence relied upon by the majority opinion was admitted not for the purpose of explaining any action taken regarding an existing will; it was to effect a revocation of the will of 1906, and for this purpose such evidence is clearly incompetent.

Not one iota of evidence is in any way related to the actual cancellation of the 1939 will. When that will was destroyed is purely a matter of conjecture.

*Manning's Estate*, 46 Pa. Superior Ct. 607, is also relied upon. The decision in that case appears to be in conflict with *Harrison's Estate,* supra, in that the subsequent will, held to have revoked the subsisting will, was not produced either as a probatable and subsisting will or as a canceled will. Clearly, this decision is contrary to the decisions of this Court.

The majority opinion refers to the doctrine of *stare decisis* and points out that *Ford's Estate,* supra, has been followed in three cases, *Shetter's Estate,* supra, *Harrison's Estate,* supra, and *Koehler's Estate,* supra. All of those cases, however, cited *Ford's Estate* in support of the principle that there cannot be revocation by parol. In *Shetter's Estate,* supra, 197, this Court said: "A writing declaring its revocation must be produced, signed by the decedent, before an earlier will can be rendered nugatory." *Harrison's Estate,* supra, held that a subsisting probable will could not be revoked by one purported to have been written subsequent thereto but which was not produced or proved. *Koehler's Estate,* supra, was of similar import. *Stare decisis* would require that in this case we should hold, as did the court below, that there can be no oral or parol revocation.

There is no long line of decisions supporting the rule laid down by the majority opinion. In fact, the majority opinion is a departure from the rule laid down in *Lawson v. Morrison,* supra, *Boudinot v. Bradford,* supra, and *Flintham v. Bradford,* supra, in which the issue now before this Court was considered. Again, *stare decisis* would prevent the enunciation of the rule now laid down by the majority opinion. *Ford's Estate,* supra, decided in 1930, is not decisive of the basic issue in this case. If it were, however, this Court need not regard itself bound by *stare decisis*. During the fifteen years since that opinion was adopted the rule therein

laid down regarding revocation of wills has not been applied to a single case. That the rule of *stare decisis* is a salutary one does not admit of argument. It does not, however, require perpetuation of an erroneous interpretation of statutory law.

Whether a distinction exists between revocation effected by a will containing a revocatory clause and one wherein the disposition of property is inconsistent with a former will need not now be passed upon.

To adopt the majority opinion would introduce into the laws of wills in this Commonwealth a most undesirable principle. Instead of establishing a rule of law by which may be determined the validity or invalidity of a valid and subsisting will, there will result a most impractical and vacillating rule. A testator will have no assurance that—as in this case—his intended disposition of property will be valid and effective. The evils which Mr. Justice SCHAFFER, in *Harrison's Estate,* supra, depicted as the probable result of permitting the contents of a destroyed instrument to be proven, will be multiplied. The door will be opened to the admission of parol evidence of "intention" and to all devious and sundry methods of perpetrating fraud and, therefore, the protection of the provision in the Wills Act for revocation in the manner therein provided would be rendered nugatory.

The decree of the court below should be affirmed for the reason that the will of 1906 has never been revoked in accordance with the requirements of the Wills Act.